Okay, the Hologic, Inc. v. Minerva Surgical, Inc. Mr. Wolfe. Thank you, Your Honor. May it please the Court, Matthew Wolfe for Hologic. In essentially every instance where petitioner and patent owner disagree, the PTAB resolved that dispute by turning to Dr. Pierce. For example, on the core issue of motivation to combine, this is at Appendix 42, quote, Petitioner's reason is supported by the testimony of Dr. Pierce. We thus determined that petitioner provides a sufficient rationale to combine the references. The problem is Dr. Pierce had no experience whatsoever, either actual or academic, in the field of uterine ablation. He didn't have any experience in uterine medical devices, in uterine perforations, in uterine fluid flow, in the risks of distending the uterus, in the risks caused by intravisation, and perhaps most importantly, did not know what the for what would and would not motivate them to look for a new or different procedure. Didn't the Board determine the level of ordinary skill in the art on the basis of the title of the patent and the specification? In other words, that this dealt with ablation of body cavities as opposed to just a uterine? It did, Your Honor, and that was plain error for multiple reasons. First of all, if we start with the statute, Section 103 says that a claim is obvious if it's obvious to one of skill in the art, quote, to which the claimed invention pertains. So we have some broader references in the specification to additional applications, but the claims at issue here were all indisputably limited to uterine procedures. And so Section 103 tells us we got to look to the claims first. And the claims are about uterine procedures, something that Dr. Pierce had no experience on. Now, even despite knowing that he had no such experience, Dr. Pierce himself said, and this is at A754, the 183 patent is generally directed to methods of detecting perforations in the uterus. And then he went on in defining what a person of skill in the art is after giving the first part of the definition, the one the PTAB adopted, to say, quote, a POSA would have been familiar with known techniques for uterine surgery. He wasn't so familiar. He himself said, Minerva itself said, this is part of the definition of a person of skill, and the PTAB simply disregarded it. So if you start from the perspective of the claims, obviously in red and light of the spec, but you start from the claims, which are about uterine surgery, and then go to a person that has no experience in uterine surgery of any kind. This wasn't a situation where he was lacking experience and then went and read up on it. He didn't know. And at his deposition, he said, I didn't do anything to prepare for this quiz. And so what basis did the PTAB have to rely on him over Dr. Martin and Dr. Evintash, who were replete with experience in the relevant art? Now, I said essentially every instance, and the reason I said essentially every instance, is to make it more complicated with regard to Claim 7. Claim 7 says, not only do you do this procedure, but first, before you start the ablation, first you test for a perforation with a pressure sensor. You do that first. The only person that spoke to that was Dr. Mirably, the other expert for Minerva. The problem with Dr. Mirably is he didn't review at all the references at issue in all. And what did the PTAB do with his testimony? They said they accepted as to Claim 7 that you would have lengthened the procedure. And this is important. The PTAB acknowledged, and this is at A33, that for Claim 7 purposes, you're not substituting a part of one reference into another. You're actually combining them, basically turning one procedure into two. They used the word, it's not a substitution, but a supplementation. The PTAB said, we're okay with that. We're okay lengthening the procedure, not withstanding everything Dr. Martin and Dr. Evintash said about the risks that presents to a patient, because, quote, Dr. Mirably gladly would have extended the duration of the procedure if the ultimate result was a safer treatment. Well, what procedure are they even talking about? Dr. Mirably didn't review the procedures, the Masterson or the Isaacson procedure, that were before the PTAB. He was instead, his declaration only talks about something called thermo-choice, which was not a reference before the PTAB, and was very different than the procedures before the PTAB, because it involved fluid in a balloon. And if you contain fluid in a balloon, by definition, you're not worried about the fluid in the other procedures that were put directly into the uterus leaking through ruptures or otherwise, or perforations, as the claim talks about. So he says, I know about this procedure called thermo-choice, and I don't worry about lengthening thermo-choice. There's no risk here. And the PTAB, for some reason, then applies that to Masterson and Isaacson, the two lead references, and says, well, there's no problem with lengthening the procedure, but those are different procedures. So at the end of the day, we have Dr. Pierce, who has no experience in uterine arts, opining about the uterine references. And on the other hand, we have Dr. Mirably, who didn't review the references, does have experience in the arts, but doesn't review the reference. So there's no expert with knowledge of the problem play that said, I have looked at Masterson and Isaacson, and I can tell you a person with skill in art would have been motivated to combine. Next issue that I'd like to raise is about the substitute claims. And focusing, for example, on 18 and 22, the substitute claims essentially took what were the original claims and added mechanical features disclosed in the specification, or features that were not present in the lead references, Masterson or Isaacson. They were present, though, in Trukai, which was a related application. And the PTAB said, well, we can just combine those, with literally no analysis of motivation to combine, literally none. There is no discussion of why one would have taken Trukai, a totally different approach to ablation, and combined it with either Masterson or Isaacson, when Masterson and Isaacson worked just fine. I mean, I think the kinetic concepts case is particularly trenchant here, when it said, because each device independently operates effectively, a person having ordinary skill in the art, who was merely seeking to create a better device to drain fluids from a wound, would have no reason to combine the features of both devices into a single device. Here we have Masterson, that works fine on its own, doesn't indicate that it has any problems. Similar, Isaacson, they're very similar devices. Then we have Trukai, which is off here. Also works well on its own. Why would these three things be combined? In order to suggest why three perfectly fine working devices would be combined, you would expect one of skill in the art to say there was something missing, there was some motivation. But that is entirely absent from the final written decision. There is zero discussion of it. With that, unless there are questions, I'd like to turn to the claim construction issue at play here. Please do. The claim construction language is monitoring for the presence of a perforation with a pressure sensor. That's what the procedure must do. It must monitor for the presence of a perforation with a pressure sensor. It can, of course, do other things as well. No one is suggesting, we're not suggesting that if a prior art reference did that, but also monitored for something else with the pressure sensor, that that would make it not invalidated. But you must at least monitor for the presence of a perforation in the uterus with a pressure sensor for this to be relevant. For some reason, the PTAB disagreed. They said, and this is at 27 of the opinion, Appendix 27, that it may also be, may be caused by perforation, but may alternatively be caused by malfunctions. So what they're saying is, and this is kind of hard to follow because it's a claim construction decision, but it's not actually put in the claim construction section of the final written decision. They actually move it into the body and then say that our arguments are rejected because broadest reasonable interpretation is much broader than what we suggest. But we have the prior art references that Masterson and Isaacson that monitor for things other than perforations with a pressure detector, with a pressure sensor, particularly mechanical failure. That's really what we're talking about here. For example, kink tubes is one of the, is one of the specific examples given. The pressure sensors, they are monitored for things other than perforations. And the panel says, well that's, the PTAB said that's good enough because the claim construction should be broader. But how can it be the case that language that calls for monitoring for the presence of a perforation is satisfied if you're not for example, Dr. Pierce, despite not being an expert, agreed for example that Isaacson cannot measure pressure drops due to perforation. So the panel found that Isaacson satisfied this claim limitation because it could monitor for kinks and hoses when that's not what the claim is talking about. That's not what the claim language is referencing. I want to conclude, I have just a minute or so before my rebuttal, by talking about what Dr. Pierce opined on, notwithstanding the fact that he had no expertise. He opined about what was conventional in the uterine arch, that's at 7.54 to 6. What Masterson and Isaacson taught to a person of skill in the arch, that's at 7.77 and 8.17. The motivation for combining these references to one in skill in the uterine arch, at 7.73 or 8.10, et cetera. He actually uses phrases like, one who knew what was going on in the uterine field would understand that, when he was not someone that would understand that. Last point I would make is just about Masterson and Isaacson specifically, on the merits. Both of these devices maintain constant pressure, that's the whole idea. In fact, if you look at Masterson, this is at 10.71, column 14, lines 34 to 37, it says pressure will be constant. That's the whole idea of the device. You maintain, of both devices, Masterson and Isaacson, you maintain a column of fluid that keeps pressure so that the fluid pressure in the uterus is constant. That's the whole purpose of the device. Masterson tells you it cannot be used to detect for perforations. It cannot be used for this purpose. Isaacson doesn't explicitly say that, but it's the same mechanical principle, so how could it? With that, how could it be said that that device would be used, as the PTAB suggested, to monitor for perforations? With that, I see I'm in my rebuttal time, and thank you. Okay. Thank you. Mr. Rosato. Thank you, Judge Newman. May it please the Court. I'd like to start by first noting a correction to an issue that was raised first in the reply brief, and it's just a comment that, along the lines that the District Court had made some findings and an argument that confirming the Board's decision here would somehow be in contrast or contradict that. That's not true. Prior invalidity has not been litigated at District Court. The PTAB is the only form in which that issue was litigated, so there's no instance of inconsistency here, and just wanted to start with the argument we heard from my friend from WHOLOGIC. I would say, as a general matter, much of the argument seems to reflect arguments that don't match what happened in this case at all, and there were a number of instances that are just, you know, flatly incorrect statements or representations of the record, and I would start with the issue of the Board's reliance on Dr. Pierce's testimony. There's actually not a single instance or single issue here in dispute where the Board relied only on Dr. Pierce's testimony. For each of the disputed issues, the Board is relying on numerous pieces of evidence, including the prior references themselves, content of those references, as well as testimony from WHOLOGIC's witnesses as well. You won't find a single instance of a disputed issue here where the Board solely relied on Dr. Pierce's testimony. It's also incorrect to characterize Dr. Pierce as having no experience in uterine ablation, and I would direct the Court's attention to page 51A51 of the decision where the Board made factual findings to this effect, noting in the context of denying WHOLOGIC's motion to exclude Dr. Pierce's testimony that Dr. Pierce has extensive knowledge relating to electrosurgical ablation device and devices as well. That's not to say that he has experience or knowledge in the uterine area, correct? No, the finding was that he does have that he does that he does have knowledge of endometrial. What's that citation? A51, Your Honor, and again this was in the context of denying their motion to exclude an issue that has not been brought up on appeal here. I'll give you a moment to find that, but at the end of the day the other thing to point out is that there's not a single instance in this case where the substance of Dr. Pierce's testimony has been shown to lack credibility. What's that citation again? A51, Your Honor. A51. It's page 51 of the Board's final written decision where the Board's talking about why they're denying WHOLOGIC's motion to exclude Dr. Pierce's testimony as unfounded. It's right in the middle of the page. Please continue. And this of course makes sense as Dr. Pierce is a professor of bioengineering. He's a renowned expert in electrosurgical devices. He literally wrote the textbook on electrosurgical devices which covers uterine ablation technologies and he described during cross-examination some experience actually working and consulting on uterine ablation projects. So this is a unfounded argument, but at the end of the day what we ask is, is the substance of a witness's testimony credible and corroborated by the evidence? In every single instance it is and there has not been a single instance identified where anything Dr. Pierce had to say lacked credibility because there is no such instance. This is a sideshow issue. Now the other thing I would say is one of the problems here with this appeal is that WHOLOGIC largely avoids the Board's factual findings on the two key core issues that were litigated in front of us. The first is on the content of the primary prior art references of Masterson and Isaacson. And that is particularly on the issue of whether those references disclose monitoring for a perforation using a pressure sensor, the alleged invention in this case. And for both of those references the Board made detailed findings of fact corroborated with various pieces of evidence that in fact disclose that aspect. Again, the invention that's being claimed. There is no showing that any of that evidence fails to qualify as substantial evidence. And again, there are multiple sources of evidence there to support those key factual findings. The second core argument... Most of the prior art seems to be directed towards detecting decreases in pressure for purposes or reasons other than perforations. I would say that's not accurate, Your Honor. So both the... Point me to one of the prior art references that deals with decrease in pressure due to a perforation. Okay, well there's the primary reference in the... There's two grounds of challenge. One based on the Masterson reference, one based on the Isaacson reference. And in the final written decision the Board goes through and explains and makes detailed findings of fact precisely why the Isaacson reference is monitoring for a explained on pages 39 through 41, 839 through 841 of the final written decision. I'm looking at the blue brief and on page 19 it says Isaacson does not disclose monitoring for the presence of perforation using a pressure sensor. Is that statement correct? No. And the Board made findings of fact that that's not In page 40 the Board states Isaacson teaches using the pressure transducers to monitor for the presence of a perforation in the uterus. Again on page 41 the Board concludes Isaacson indicates that uterine perforation can be detected from changes in flow rate which can be measured using pressure. And the Board goes through and makes a very detailed analysis of the content of the Isaacson reference, explains how that reference is expressly stating that they're monitoring for perforations, they're doing it based on a calculation of flow differential, and the Board explains that their flow measurements are made using pressure sensors. And then the Board concludes therefore Isaacson teaches monitoring for a uterine perforation using pressure sensors. Where is the Board's suggestion of combining these references? It comes in two places. So again let's look at what what's being offered and what's being combined. So to say this is we're looking at the combined teachings of references. So for in each instance the Board's making factual findings that the primary references themselves teach this key limitation. The secondary references are confirming that interpretation. That's true in the context of the Masterson reference where Masterson specifically mentions using pressure sensors to detect an under-pressure situation in the uterus and then alarming the physician of such an instance. The question is what is, would an under-pressure situation include a uterine perforation? And the Board interpreted that reference and said yes in fact it would. And they had multiple reasons for coming to that conclusion. One is looking at the secondary reference of Val Duke which was the combination here where that where the Val Duke reference is specifically measuring for perforations using a pressure sensor. So it's looking at the combined teachings there. They went through Dr. Pierce's testimony that confirmed the logics expert Dr. Martin's testimony that confirmed that such an under-pressure situation would be a uterine perforation. There are multiple pieces of evidence to support this. Again a key factual findings where that you won't see in the blue brief some substantial evidence. They don't lack substantial evidence and there's no showing that they do. Same type of analysis when we get to Isaacson. Walk through and the Board makes detailed factual findings why that reference is monitoring for perforation using a pressure sensor and then looking at various pieces of evidence that confirm that. As far as you know the safety rationale which Hologic focuses on in terms of a lacking rationale there's no there's no mystery there as to what argument the Board was crediting and why they were crediting it. This can be found at both A25 and A27 of the of the record pages 25 through 27 of the Board's final written decision where the the safety rationale they're specifically crediting the argument that was advanced in the petition materials that this perforations holes in the uterus during this ablative procedure were recognized safety risk because you know as admitted in the blue brief this is actually on page page 7 of the blue brief it's acknowledged that this was a recognized risk in the field. The page 27 exactly why they are crediting that argument they say Minerva's argument is specifically corroborated by the prior art references and they point to multiple prior prior art references including the Masterson reference which specifically states that they're using a under pressure alarm detection monitoring for the purposes of and I'm quoting increased safety to the patient. So the saying it's credited and then saying exactly why it's credited it's an argument that's expressly corroborated with the prior references that's as good as a rationale gets and that's explained it's certainly reviewable which was the issue that was raised. Unless there are any questions about the rationale in terms briefly to the plane construction issue and you know as explained in the response brief this is less about a claim construction issue and really it has to be taken in context of the argument as being advanced what the board was stating. The board it you know when it makes a secondary paragraph about you know the scope of the claims. Is there ever any actual dispute over the phrase monitoring for the presence of a perforation in the uterus using a sensor? No, no nobody proposed the whole logic never proposed some construction of of that that which would have excluded the prior art. What they were arguing they're trying essentially trying to read this really came back to the arguments about the content of the prior art references. The logic was trying to advance an argument that the primary references must be limited only to certain types of causes of under pressure situations and the board went through and evaluated the evidence on that issue and said that just doesn't make sense that the term the language of the claim is monitoring for a perforation using a pressure sensor. The language is not monitoring only for a perforation using a pressure sensor and that was important in view of how this is described in not only the 183 patent but in all of the prior art references. Perforation detection based on pressure is described as measuring with a pressure sensor the detection of an under pressure situation. Once that's detected an alarm goes off to the user and they're instructed to investigate with a cause of that whether it's some equipment malfunction or or a perforation. That is exactly how it's described in a 183 patent where it repeatedly references an under pressure situation as a possible perforation and indicates that the physician should be alerted to investigate the situation. That's how it's described in in the other prior art references and that is how it's described in the Thermo Choice product literature, an admitted prior art system that existed at the time. That system is described describes the process as running a pressure check if a pressure problem is is detected the manual instructs the user to inspect the equipment, rule out an equipment malfunction, if they can't rule out an equipment malfunction inspect the uterine cavity for a perforation. So what the board was saying is what you know in trying to argue that limitation into the prior art you seem to be ignoring what your claim requires and how this process is described in your own specification. So it's more of about an issue of the content of prior references less about a claim construction per se. This is briefed I do want to address one issue if I may before and that is this you know I mentioned there were two issues that were really you know core to the to the to the board's decisions and and key arguments in the case. The second was this this argument about there being no rationale for for obviousness on the basis of the alleged conventional wisdom or state of state of the art at the time. This is a a core argument that Whole Logic advanced before the board and the board explained in its final written decision exactly why it had rejected this argument. There's no ambiguity here the board made specific findings of fact of multiple evidence and found quote patent owner misrepresents the conventional wisdom or state of the art end quote. Whole Logic tried to advance a false narrative in their non-obviousness arguments before the board and the board called them out on it and there's really no way for me to sugarcoat that and that's you can see that the quote I mentioned by the way is a31 of the record and there are detailed findings and explanations by the board on that point. Thank you I'd like to begin Judge Reina with your question about whether Dr. Pierce had any experience. This is the quote this is the underlying site that the board relied on. What personal this is at appendix 2246 page 24. What personal experience do you have that would lead you to know how a uterus was conventionally distended in November 1999? Well that's what the VESPA system did. Is the VESPA system discussed or mentioned at all in your CV? It is not sir and I think you told me earlier this morning that you didn't rely on your one-day experience with the VESPA system informing any of your opinions in this case right? I So the P tab says Dr. Pierce is experienced in this when Dr. Pierce himself says I have one-day experience and I didn't even rely on it. This is the kind of substantial evidence question we're facing. Similarly counsel my friend just said he didn't want to sugarcoat or suppose it under misrepresentation about the state of the art. Remember the state of the art was offered not by Dr. Pierce but by Dr. Miraboli. Dr. Miraboli who never reviewed the art in question. So when they said well the conventional wisdom was wrong we misrepresented it he was talking about this thermo choice device that has nothing to do with the IPR. He was not reviewing at all the actual references at issue in this case. I want to talk secondly about this notion that there was the evidence was replete it wasn't just Dr. Pierce but I would look at ask you to look at appendix 41 and 42 where they're explaining the P tab is explaining why they found a motivation to combine. They say third patent owner argues that petitioner fails to provide a sufficient rationale to combine Masterson and Bulldog. He then says the P tab then cites two sentences referencing petitioners reasoning not evidence no evidence. The only evidence than they cite is Dr. Pierce. So we have on the one hand Dr. Evan Tash and Dr. Martin who say and let's focus just on claim seven for the moment if nothing else your ask you to look at claim seven where it was unambiguous the P tab said this would lengthen the procedure this would be stacking one reference on top of another it would unambiguously lengthen the procedure Dr. Martin and Dr. Evan Tash said you wouldn't want to do that that would have been contrary to the state of the art of the time everything would push you against that. The only response to that was Dr. Pierce who acknowledged he had no experience he didn't know what folks wanted to do at the time. There is no substantial evidence even the site we were led to page 40 where your honor you asked about what Isaacson taught and I would note that it's unambiguous and that Masterson and Isaacson don't talk about pressure they talk about flow rate for Isaacson that's at a 1091 page 14 4 to 10. Look at the site the P tab uses Isaacson teaches using the pressure transducers to monitor for the presence of a Pierce someone who admitted he had no experience at the time he had no experience at any time he didn't try to develop that experience for purpose of the IPR. Once you pull Dr. Pierce's testimony out or give it the proper weight the whole house of cards collapses not only is there not substantial evidence there is quite literally no evidence in support of the P tab's conclusion and particularly as to claim seven where there is not a case who said I've looked at the prior art and I find that there's a motivation to combine as to claim seven because Dr. Moraboli didn't look at the prior art of record and Dr. Pierce didn't look at the issue of the of the stacking. So with that I'd like to turn just to the final point on the claim construction issue. If you accept the fact that you must at least not exclusively but at least have a pressure sensor monitoring for uterine perforation then there is no evidence that Masterson or Isaacson does that. If you accept at a minimum we should be remanded for a proper claim construction where they say that yes you can do other things but you must at least do what the claim says. That's why there was no claim construction dispute below because the plain meaning is the plain meaning. The board so as font they said we'll add these alternatives instead of monitoring for for perforation you can monitor for kinks in the hoses or catastrophic mechanical failure. Well the the board cites Isaacson and it says and I'm not going to read the whole quote I'm looking at page 40 towards the end of that paragraph it says that I still states that by monitoring the volume and flow rate of the fluid discharged from the uterus then it goes on and says the possibility of uterine perforation can be detected by these means. So what Isaacson does is it basically it measures it says it Isaacson does test for perforations because it has that column of fluid. It does or does not? It tests for perforations but not with pressure. It uses an entirely different perfectly adequate means. It does it with flow rate. That's the whole point and the only connection between flow rate and pressure sensing which is our invention we say we don't want to use flow rate. We know Isaacson uses flow rate. The board made a factual finding that the possibility of uterine perforation can be detected by these means and it's speaking about Isaacson. But it's but it's as I said Isaacson itself says flow rate. The connection the board makes is based on Dr. Pierce saying that flow rate and and pressure are one in the same thing. If you look at again 1091 page 14 4 to 10 you will see that Isaacson is talking about flow rate not pressure and the board made that contrary distinction because and it's right there on the fourth line from the bottom see exhibit 1002 paragraph 162 testimony of Dr. Pierce. It was Dr. Pierce not Isaacson that said flow rate is tantamount to pressure. With that your honor I'm not sure if there's any other questions but as I said thank you very much.